UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEVON ENERGY CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 04-CV-0821 (GK) |
| GALE A. NORTON, | ) | |
| Secretary of the Interior, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

Plaintiff Devon Energy Corporation ("Devon"), a natural gas producer, seeks review of a decision by the Department of the Interior ("Interior").[1]  Interior held that Devon could not deduct certain costs when it calculated the royalties owed to the government pursuant to its lease to extract natural gas from federally-owned land.  Devon principally argues that Interior's decision violates the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, because it reinterprets Interior regulations in a manner fundamentally different from the agency's prior interpretation of the same regulations.  The following analysis establishes that Interior did not reinterpret a prior authoritative interpretation of its regulations in violation of the APA, and hence was not required to conform to the APA's notice and comment provisions.

### BACKGROUND

_____

[1]Judge Gladys Kessler referred the pending motions for summary judgment to this judge on December 22, 2006.

A.       **Statutory and Regulatory Background**[2]

Beginning in the 1980s, technological innovations made possible the large-scale

extraction of a natural gas variety known as "coalbed methane."  Coalbed methane is gas that is

trapped in underground coal seams and held in place by hydraulic pressure.  To extract the gas, a

producer like Devon lifts the pressure on the coalbed, causing the coalbed methane to escape.

The gas is then captured and gathered to a central delivery point ("CDP"); removed of any excess

carbon dioxide; and dehydrated and pressurized to render it suitable for transport.  Only by

completing this process does coalbed methane become marketable for use.

The federal government owns land in the Powder River Basin of Wyoming, which is rich

in natural gas.  It leases rights to extract the gas in exchange for a statutorily fixed percentage of

the proceeds.[3]  Interior, through its subagency the Minerals Management Service (MMS),

promulgates rules for the regulation of the relationship between the government and its natural

gas lessees, and issues and administers the leases in accordance with those rules.

In 1988 MMS "amended and clarified" the rules "governing valuation of gas for royalty

computation purposes."  Revision of Gas Royalty Valuation Regulations and Related Topics, 53

Fed. Reg. 1230 (Jan. 15, 1988).  These new rules specified that the "value of production" referred

to in 30 U.S.C. § 226(b)(1)(A) must be no less than "the gross proceeds accruing to the lessee for

---

[2]Much of the following statutory and regulatory background has been taken, without
attribution for ease of readability, from then-Judge Roberts' opinion in *Amoco Production Co. v.
Watson*, 410 F.3d 722 (D.C. Cir. 2005), and the Supreme Court's opinion in *Amoco Production
Co. v. Southern Ute Indian Tribe*, 526 U.S. 865 (1999).

[3]The Mineral Leasing Act requires producer-lessees to pay the government-lessor "a
royalty at a rate of not less than 12.5 percent in amount or value of the production removed or
sold from the lease."  30 U.S.C. § 226(b)(1)(a).

lease production," minus certain allowable deductions. 30 C.F.R. § 206.152(h) (1988). A longstanding interpretation of the Mineral Leasing Act (MLA) obligates lessees to put the gas they extract in "marketable condition at no cost to" the federal lessor, thereby precluding deduction of such costs. *Id.* § 206.152(i); *see California Co. v. Udall*, 296 F.2d 384, 387-88 (D.C. Cir. 1961) (upholding marketable condition requirement).

Lease products are considered in marketable condition if they "are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 206.151. If a lessee sells "unmarketable" gas at a lower cost, the gross proceeds for purposes of royalty calculation must be "increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services" to place the gas in marketable condition. *Id.* § 206.152(i). To take a simple example, if it costs a producer $20 to put gas in marketable condition by dehydrating and compressing it, and the producer sells the dehydrated and pressurized gas for $100, "gross proceeds" for purposes of royalty calculations is $100, regardless of whether the producer dehydrates and pressurizes and then sells the gas for $100, or instead sells the gas for $80 to a purchaser who dehydrates and pressurizes it.

Importantly, the regulations allow lessees to deduct from gross proceeds costs directly related to transporting the gas from the wellhead for sale at markets remote from the leasehold. *See id.* § 206.157(a)-(b).

**B.    Factual Background**

The facts of this case are undisputed.

Devon is a producer of coalbed methane and a lessee of the federal government in

Wyoming's Powder River Basin.  Devon gathers the gas from various wells in the Basin to

CDPs, where the gas is measured to calculate the amount of royalty owed to the federal lessor.

Pl.'s Stmt of Material Facts as to Which There Is No Genuine Issue ("Pl.'s Stmt") ¶¶ 2-4 (May 4,

2005) [dkt #24].

After being gathered to the CDP, the coalbed methane leaves the CDP through a pipeline

to one of Devon's chemical plants, some 126 miles away.  There Devon removes the excess

carbon dioxide thereby rendering the gas into marketable condition for sale to third parties.  To

travel the pipeline, however, the gas also must be compressed and dehydrated.  As noted above,

Interior regulations permit Devon to deduct from their gross proceeds the costs relating to the

transport of the gas to the chemical plant.  However, the marketable condition rule prohibits

deductions of costs necessary to render the gas saleable "under a sales contract typical for the

field or area," 30 C.F.R. § 206.151.  The regulations do not expressly state whether the costs of

dehydrating and compressing coalbed methane are (a) deductible transportation costs or (b) non-

deductible costs for rendering the gas into marketable condition.  *See* Pl.'s Stmt ¶¶ 5-10.

In November 1995 Interior convened the Royalty Policy Board to consider how the

marketable condition rule should be interpreted with regard to these compression and

dehydration costs.  In 1995-96, the guidance generated from this meeting was distributed by way

of two valuation and reporting Guidelines (the "Guidelines") published on Interior's website, as

well as a Dear Operator Letter (the "Letter") sent to interested parties.  *See id.* ¶¶ 12-21.

The parties dispute the meaning of the Board's specific guidance in the Guidelines and

Letter.  According to Devon, the Board allowed the producer to deduct the costs of dehydration

and compression, provided they were incurred after the gas reached the CDP and were necessary

-4-

for transportation.  *See* Pl.'s Stmt of Points and Authorities in Support of Pl.'s Mot. for Summ. J.

("Pl.'s Mem.), at 9-10 (May 4, 2005) [dkt # 24]; Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J.

("Def.'s Mem."), at 9-10 (Jun. 17, 2005) [dkt #28].  According to Interior, the Board's

conclusions were ambiguous and, if interpreted as Devon viewed them, erroneous.  *See id.*;

Def.'s Rep. to Pl.'s Opp. to Def.'s Cross-Mot. for Summ. J. ("Def.'s Rep."), at 7-10 (Aug. 17,

2005) [dkt #33].  Moreover, declares Interior, the Board was without authority to issue a binding,

authoritative interpretation of the marketable condition rule on behalf of the agency.  *See id.* at

16.

In 2002, Devon requested that MMS confirm that deducting the post-CDP dehydration

and compression costs from the royalty calculation, as set forth in the Guidelines and Letter,

complied with Interior's marketable condition regulation.  Pl.'s Stmt ¶ 26.  In 2003, an Acting

Assistant Secretary of the Interior ruled in a final agency decision that the Royalty Policy Board's

interpretation of the regulations was either ambiguous or in error, and that Devon could not

deduct the post-CDP dehydration and compression costs as transportation costs.  *Id.* ¶ 27;

Compl., Ex. B, at 25 (Agency Decision of Oct. 9, 2003) [dkt #1].  This litigation followed.

## DISCUSSION

### I.      The Legal Standard

Summary judgment is granted if there is no genuine issue as to any material fact and if the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The standard of

judicial review of Interior's interpretation of its own regulations implementing the MLA, the case

here, is well known:

Although [the courts] will not allow an agency to rewrite

> regulations under the guise of interpreting them, [they]
> nevertheless owe substantial deference to an agency's
> interpretation of its own regulations, giving that interpretation
> controlling weight unless it is plainly erroneous or inconsistent
> with the regulation. Such deference is particularly appropriate in
> the context of a complex and highly technical regulatory program
> [such as the MLA], in which the identification and classification of
> relevant criteria necessarily require significant expertise and entail
> the exercise of judgment grounded in policy concerns.

*Amoco Production Co. v. Watson*, 410 F.3d 722, 728-29 (D.C. Cir. 2005) (original alterations,

quotation marks, and citations omitted).

## II.      APA § 553 Claim

Section 553 of the APA requires that a formal administrative rule be implemented

through notice and comment procedures. *See Independent Petroleum Assoc. of America v.*

*Babbitt*, 92 F.3d 1248, 1256 (D.C. Cir. 1996). The D.C. Circuit has also ruled, however, that

"[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it

would formally modify the regulation itself:  through the process of notice and comment

rulemaking." *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997).

The question here is whether the Guidelines and Letter constitute an "authoritative

interpretation," *id.*, of the marketable condition rule, such that Interior's repudiation in the

decision presently under review must undergo notice and comment procedures. All parties agree

that the Guidelines and Letter, standing alone, do not constitute an authoritative interpretation of

a rule sufficient to bind the agency. *See Independent Petroleum*, 92 F.3d at 1256-57; Pl.'s Rep.

in Supp. of Its Mot. for Summ. J. & Its Opp. to Def.'s Cross-Mot. ("Pl.'s Rep."), at 6 & n.4 (Jul.

13, 2005) [dkt #30]. Rather, Devon argues that these guidances plus subsequent actions by

Interior comporting with their interpretation is sufficient to bind the agency as an authoritative

interpretation.  *Id.*

The parties present two diverging paradigms for understanding the nature of Interior's actions.  From Devon's perspective, the 1995-96 Guidelines and Letter uttered by the Royalty Policy Board constitute a new and not unreasonable interpretation of the marketable condition rule that has been in effect for over 60 years.  The new interpretation of the rule was necessary to address the technological innovations in the 1980s making profitable the collection of coalbed methane.  Thus, the Board was called upon to decide how the marketable condition rule would apply to this relatively recent practice of collecting and refining coalbed methane.  In other words, Devon argues, the Guidelines and Letter are a new *application* of the marketable condition rule, which are binding on Interior.

Even if Devon's paradigm were correct, that does not mean it wins.  As Devon acknowledges, the policy statements or informal interpretations in the Guidelines and Letter are not binding on Interior, *unless Interior affirmatively adopted them*, by way of complying with them in a longstanding practice.  *See Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999).

Interior's paradigm is quite different.  Interior views the 1995-96 Guidelines and Letter as an anomaly or error in a long line of Interior policy statements and interpretations that have consistently interpreted, for decades, the marketable condition rule in accordance the view taken by the 2003 decision rejecting Devon's interpretation.  Interior de-emphasizes the significance of the newness of coalbed methane collection, noting instead that the original marketable condition rule applies to *all* natural gas.  It cites a long line of adjudications and federal court decisions applying the marketable condition rule consistently with the 2003 decision, regardless of whether

the costs of bringing the gas to a marketable condition were incurred before the gas reaches the CDP, at the CDP, or after it has passed through the CDP.  According to Interior, the Guidelines and Letter (or Devon's interpretation of them) are an anomaly that sticks out like a sore thumb.

Moreover, Interior disputes that it ever authoritatively adopted the interpretation stated in the Guidelines and Letter.  Although it acknowledges that since 1995-96 its employees may have approved deductions for coalbed methane like the ones Devon wishes to make, it also notes at least one instance since that time when it did not allow such a deduction.  Moreover, Interior cites numerous decisions where, with respect to natural gas, it uniformly denied a transportation deduction based upon the geographic location (*i.e.*, downstream of the CDP) of the natural gas.

Interior has the better of the argument.

In favor of its paradigm, Devon relies principally on two cases, neither of which is controlling here.  The first is *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001), in which the Fifth Circuit, purportedly relying on the D.C. Circuit's holding in *Alaska Professional*, held that Interior could not require an additional certification from FERC as a prerequisite to receiving a particular transportation deduction.  The Fifth Circuit held that Interior's "undeniably . . . long established and consistently followed practice" of not requiring an additional certification could not be altered without notice and comment.  *Id.* at 630.  Next Devon relies upon a district court case, *Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113 (D.D.C. 2001), holding, on virtually the same facts as *Shell Offshore*, that Interior had failed to comply with APA notice and comment procedures before requiring the certification overlay for the approval of transportation deductions.  *Id.* at 128.

These two cases facially appear to have analogous facts to the decision now under review.

However, in both *Shell Offshore* and *Torch* there was no question that Interior had made a change in policy and departed significantly from a consistent, prior practice of not requiring the certification.  *See Shell Offshore*, 238 F.3d at 630 (prior interpretation was "undeniably" a long established and consistently followed practice); *Torch*, 172 F. Supp. 2d at 125-26 (same).  By contrast, in the case *sub judice*, there is considerable doubt whether Devon's preferred interpretation of the marketable condition rule is consistent with Interior's longstanding position that the rule does not permit deduction of costs based upon the geographic location of where the costs were incurred (here, upon leaving the CDP).  *See Amoco*, 410 F.3d at 729 (upholding Interior's position in this regard).  That is to say, it is not all clear that the 2003 decision is a departure from a longstanding practice of Interior.  This alone suffices to distinguish the situation here from the cases relied upon by Devon, neither of which is controlling here.

Two cases that are controlling, on the other hand, address precisely the prerequisites necessary for guidances such as the Guidelines and Letter to become a definitive interpretation, binding on the agency and alterable only by way of notice and comment.  In both cases, the D.C. Circuit held that where the agency's prior interpretation of a regulation—alleged to be invulnerable to change absent notice and comment—is either ambiguous (that is, not clearly a departure from the subsequent, definitive interpretation) or a mere policy statement, it is not binding on the agency, and the agency may render later decisions arguably inconsistent with the policy statement or ambiguous interpretation.  Here, the Guidelines and Letter constitute a policy statement of enforcement, not an interpretation of the marketable condition rule; and even if considered such an interpretation, the interpretation is ambiguous, and hence Interior's 2003 decision rejecting Devon's deductions is not inconsistent with the marketable condition rule.

In the first case, *Hudson v. FAA*, 192 F.3d 1031 (D.C. Cir. 1999), the D.C. Circuit held that a 1989 advisory circular issued by the FAA was a policy statement rather than an interpretation of an FAA regulation and therefore not subject to the administrative law principle that a prior authoritative interpretation of a regulation can only be changed by notice and comment rulemaking. *Id.* at 1036 (*Alaska Professional*, 177 F.3d at 1035, and *Paralyzed Veterans*, 117 F.3d at 586, distinguished). The FAA's 1989 advisory circular called for actual demonstrations of an aircraft's safety but warned that these were "not the only means[] of compliance" with FAA's regulatory requirements. *Id.* at 1033 (quoting the circular). The court held that abandoning the demonstration requirement did not require notice and comment.

Likewise, the Guidelines and Letter (allegedly) allow for the deductions Devon seeks from its royalty payments, but they also make clear that dehydration and compression costs that serve both transportation and marketable condition costs "should be referred to [MMS] to determine the appropriate allocation." Compl., Ex. G, Guidelines Memorandum, at 2 (Dec. 8, 1995); *id.*, Ex. H, Dear Operator Letter, at 3 (Apr. 22, 1996) (same); *see also id.*, Ex. F, Guidelines Memorandum, at 2 (Dec. 7, 1995) (confirming that lessee has burden of proving that dehydration and compression costs were related to transportation). Nothing in the Guidelines or Letter purports to reinterpret definitively the marketable condition rule with respect to coalbed methane. Rather, the guidance was issued at the request of several coalbed methane producers in San Juan, Arizona, because of confusion over their allowable costs. At that time, perhaps, MMS had a policy of allowing dehydration and compression costs that occurred post-CDP; but that does not mean Interior's decision to disallow the costs now is invalid: That decision "is not a different interpretation of the regulation, just an application of the regulation to

-10-

a changed situation which calls for a different policy." *Hudson*, 192 F.3d at 1036.

Second, in *Darrell Andrews Trucking v. FMCSA*, 296 F.3d 1120 (D.C. Cir. 2002), the court of appeals held that a plaintiff making Devon's claim "must show that the 'agency has given its regulation a definitive interpretation, and later significantly revise[d] that interpretation.'" *Id.* at 1125 (quoting *Alaska Professional*, 177 F.3d at 1034). The court held that where the agency has issued ambiguous guidances concerning its position on a regulation, as well as a clear decision that adhered to the agency's most recent understanding of the regulation, the ambiguous guidances did not constitute a binding "definitive interpretation." *See id.* at 1127-28. Likewise, here the Guidelines and Letter are arguably ambiguous (though Devon contends they are not). But even if the guidances are construed in favor of Devon's interpretation, a formal adjudication by Interior repudiates that view, *see J-W Operating Co.*, 159 IBLA 1, 12 (2003) (noting that "it has been held repeatedly that the [the costs for] dehydration of gas to meet market specifications for water content and the compression of gas to the pressure required for entry into the buyer's pipeline are not deductible"), and Interior cites at least one instance where Devon's position on calculating coalbed methane royalties was rejected by the agency, *see* Def.'s Rep., Ex. A. In light of this clear conflict, the balancing of which favors Interior's interpretation of the regulation, to paraphrase the D.C. Circuit in *Darrell Andrews*, "in the midst of the period in which [Interior] issued the ambiguous [Guidelines and Letter] relied upon by [Devon], it issued a clear decision that confirms the interpretation applied by the agency in this case. [Devon] is therefore unable to show that the decision below represents a substantial change in the agency's construction of" the marketable condition rule and cannot sustain a challenge under *Alaska Professional*. *Darrell Andrews*, 296 F.3d at 1128.

Finally, a word on *Alaska Professional*, upon which Devon relies heavily.  In that case, the D.C. Circuit ruled that an agency violates § 553 when it  affirmatively adopts an interpretation, by way of complying with that interpretation through longstanding practice, and then repudiates that interpretation without notice and comment.  177 F.3d at 1033-34 (relying on *Paralyzed Veterans*, 117 F.3d at 586).  However, the court was careful to note that "when [an unauthoritative body] gives an interpretation of a regulation or provides advice to a regulated party, this will not necessarily constitute an authoritative administrative position, particularly if the interpretation or advice contradicts the view of the agency as a whole," and hence a subsequent rejection by the agency of that position will not violate § 553.  *Id.* at 1035.  Here, the views of the Royalty Policy Board are not authoritative on behalf of Interior.  Devon concedes as much by acknowledging that absent some sort of longstanding, consistent adherence to the Guidelines and Letter, it cannot sustain its cause based on the Board's guidances.  *See* Pl.'s Rep., at 5-6 & n.4; *Amoco*, 410 F.3d at 732 (holding that MMS guidance letters are not binding on the agency, and citing *Independent Petroleum*, 92 F.3d at 1257).  Also, as the *Hudson* case made clear, *Alaska Professional* was a unique situation where the agency had adhered to a particular interpretation of the regulation for some thirty years, issuing formal adjudications that were consistent with and adopted that interpretation, before repudiating it.  *See Hudson*, 192 F.3d at 1036; *Ass'n of American Railroads v. DOT*, 198 F.3d 944, 950 (D.C. Cir. 1999) (noting *Alaska Professional* relied on "administrative common law" to substantiate the original interpretation).  Finally, *Alaska Professional*'s holding has been further narrowed on the ground that it applies only where a turnabout in interpretation upsets substantial financial expectations based upon the original interpretation.  *Id.*

-12-

**III.     APA § 706 Claim**

Devon also claims that disallowing the post-CDP deductions for dehydration and compression costs is an unreasonable reading of the marketable condition regulation, and hence "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706.  However, the judicial standard of reviewing with deference an agency's interpretation of its own regulations prevents overturning it pursuant to APA § 706.  *See Auer v. Robbins*, 519 U.S. 452, 461-463 (1997); *Amoco*, 410 F.3d at 728-29; *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-845 (1984).

Devon argues that Interior's interpretation of "marketable condition," that is, gas conditioned for the specific market into which it is actually sold, is contrary to the plain language of the regulation which defines marketable condition as gas conditioned to such an extent that it "will be accepted by a purchaser under a sales contract typical for the field or area," 30 C.F.R. § 206.151.  However, this argument is foreclosed by *Amoco*, which held, in rejecting a substantially similar argument, that the regulation "does not contain a geographic limit."  *Amoco*, 410 F.3d at 729.  Devon also argues, much like the plaintiff in *Amoco*, that Interior departed from agency precedent and original intent in issuing the 2003 decision prohibiting deduction of costs that were incurred past the geographical boundary of an off-lease central accumulation point. That argument also is foreclosed by the *Amoco* decision.  *Id.* at 730.  Finally, Devon argues, half-heartedly, that it alone is subject to the (allegedly) grievous 2003 Interior decision, and hence is being treated unfairly in comparison with other similarly situated gas producers.  The argument is without merit, and Devon acknowledges that Interior has already begun to apply the 2003 decision to other gas producers.  *See* Pl.'s Praecipe (Oct. 7, 2005) [dkt #40].

-13-

**CONCLUSION**

For the foregoing reasons, an accompanying order will deny plaintiff's motion for summary judgment and grant Interior's cross-motion for summary judgment.

/s/

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

Dated:  August 23, 2007